No. 25-20364

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JARROD PREJEAN,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

_____

BRIEF FOR APPELLANT
_____

PHILIP G. GALLAGHER
Federal Public Defender
Southern District of Texas

KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

## CERTIFICATE OF INTERESTED PERSONS
United States v. Jarrod Prejean,
No. 25-20364

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    The Honorable George C. Hanks, Jr., U.S. District Judge.

2.    The Honorable Thad Heartfield, U.S. District Judge.

3.    The Honorable Richard W. Bennett, U.S. Magistrate Judge.

4.    Jarrod Prejean, Defendant-Appellant.

5.    United States of America, Plaintiff-Appellee.

6.    Counsel for Plaintiff-Appellee: United States Attorney Nicholas J. Ganjei; and Assistant United States Attorneys Anhkhoa Thien Tran and Carmen Castillo Mitchell.

7.    Counsel for Defendant-Appellant: Federal Public Defender Philip G. Gallagher; and Assistant Federal Public Defenders Rachael Melby, Evan G. Howze, and Kathryn Shephard.

8.    Former counsel for Defendant-Appellant: Equator L. Turner, Esq.

s/ Kathryn Shephard
KATHRYN SHEPHARD

i

## REQUEST FOR ORAL ARGUMENT

Defendant-Appellant Jarrod Prejean requests oral argument. This appeal raises significant fact-intensive issues concerning the sufficiency of the evidence. Counsel therefore believes that oral argument would be beneficial to the Court.

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ...........................................................i

REQUEST FOR ORAL ARGUMENT ................................................................. ii

TABLE OF CONTENTS.................................................................................. iii

TABLE OF CITATIONS ..................................................................................v

STATEMENT OF JURISDICTION...................................................................1

STATEMENT OF THE ISSUES.......................................................................2

STATEMENT OF THE CASE..........................................................................3

      A.     The original sentence and first revocation. ...........................................3

      B.     The instant revocation proceedings......................................................4

            1.     Violation 1................................................................................4

            2.     Violation 2................................................................................9

            3.     Violation 3................................................................................9

            4.     Arguments and the district court's rulings...............................16

      C.     The appeal. .........................................................................................18

SUMMARY OF THE ARGUMENT ..................................................................19

ARGUMENT ..................................................................................................21

     **ISSUE ONE RESTATED**: The district court reversibly erred by finding that the evidence was sufficient for Violation 3 and basing its revocation sentence on that finding and an incorrect, higher Chapter 7 Guidelines range. .............................................................................21

## TABLE OF CONTENTS – (cont'd)

**Page**

A.    Standard of review..................................................................21

B.    The evidence was insufficient as to Violation 3 ................................22

C.    Without Violation 3, the Guidelines range would have been lower. ................................................................................ 26

**ISSUE TWO RESTATED**: The district court reversibly erred by basing its revocation sentencing decision in part on Violation 1, for which the evidence was insufficient..............................................28

A.    Standard of review..................................................................28

B.    The evidence was insufficient as to Violation 1 ................................29

C.    The district court erred by factoring the unproven Violation 1 into its sentencing decision. ...........................................................34

**ISSUE THREE RESTATED**: The district court plainly erred by classifying Violation 1 as a Grade B Violation.............................................38

A.    Standard of Review ............................................................... 38

B.    The district court clearly and obviously erred by classifying Violation 1 as a Grade B violation......................................................39

C.    The error affected Mr. Prejean's substantial rights............................41

D.    The error should be corrected by this Court because it seriously affects the fairness, integrity, and public reputation of judicial proceedings...........................................................................42

CONCLUSION ........................................................................45

CERTIFICATE OF SERVICE ........................................................46

CERTIFICATE OF COMPLIANCE...................................................47

## TABLE OF CITATIONS

**Page**

### CASES

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................ 22

*Janjua v. State*, 991 S.W.2d 419
  (Tex. App.–Houston [14th Dist.] 1999, no pet.) ............................................. 30-33

*Medina v. State*, 411 S.W.3d 15
  (Tex. App.–Houston [14th Dist.] 2013, no pet.) ...................................... 16, 30-33

*Molina-Martinez v. United States*, 578 U.S. 189 (2016) ........................... 38, 41-42

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) ......................................... 42

*Utah v. Su*, 109 F.4th 313
  (5th Cir. 2024) ................................................................................................. 36

*United States v. Anderson*, 559 F.3d 348
  (5th Cir. 2009) ................................................................................................. 38

*United States v. Cardona-Garcia*, No. 23-40301,
  2024 WL 3833285 (5th Cir. Aug. 15, 2024) (unpublished) ............................... 41

*United States v. Delgado-Martinez*, 564 F.3d 750
  (5th Cir. 2009) ................................................................................................. 35

*United States v. Diaz*, 116 F.4th 458
  (5th Cir. 2024) ................................................................................................. 38

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) ..................................... 41

*United States v. English*, 400 F.3d 273
  (5th Cir. 2005) ................................................................................................. 37

*United States v. Foley*, 946 F.3d 681
  (5th Cir. 2020) ............................................................................................. 21, 28

# TABLE OF CITATIONS – (cont'd)

**Page**

## CASES – (cont'd)

*United States v. Guillen-Cruz*, 853 F.3d 768
  (5th Cir. 2017) ................................................................ 41

*United States v. Jones*, 475 F.3d 701
  (5th Cir. 2007) ................................................................ 24

*United States v. Kippers*, 685 F.3d 491
  (5th Cir. 2012) ................................................................ 34

*United States v. Luna-Gonzalez*, 34 F.4th 479
  (5th Cir. 2022) ................................................................ 24

*United States v. Mathena*, 23 F.3d 87
  (5th Cir. 1994) ................................................................ 38

*United States v. McCormick*, 54 F.3d 214
  (5th Cir. 1995) ................................................................ 21, 28

*United States v. McKinney*, 520 F.3d 425
  (5th Cir. 2008) ................................................................ 22, 38

*United States v. Mims*, 992 F.3d 406
  (5th Cir. 2021) ................................................ 22, 27, 35, 42-43

*United States v. Minnitt*, 617 F.3d 327
  (5th Cir. 2010) ................................................................ 21, 28

*United States v. Santos*, 624 Fed. Appx. 232
  (5th Cir. 2015) (unpublished) ................................................ 28, 35

*United States v. Santos*, No. 23-20559, 2024 WL 4457455
  (5th Cir. Oct. 10, 2024) (unpublished) ...................................... 35

*United States v. Seawright*, 703 Fed. Appx. 285
  (5th Cir. 2017) (unpublished) ................................................ 36

# TABLE OF CITATIONS – (cont'd)

**Page**

## CASES – (cont'd)

*United States v. Soliz*, 344 Fed. Appx. 900
  (5th Cir. 2009) (unpublished) ....................................................... 28, 35

*United States v. Terrell*, 983 F.2d 653
  (5th Cir. 1993) ........................................................................... 36

*United States v. Tobias*, 662 F.2d 381
  (5th Cir. Unit B Nov. 1981) ......................................................... 34

*United States v. Warren*, 720 F.3d 321
  (5th Cir. 2013) ........................................................................ 21, 34

*United States v. Winding*, 817 F.3d 910
  (5th Cir. 2016) ........................................................................... 21

## STATUTES AND RULES

18 U.S.C. § 371 ............................................................................... 3

18 U.S.C. § 2314 ............................................................................. 3

18 U.S.C. § 3553(a) ....................................................................... 21

18 U.S.C. § 3553(c) .................................................................... 17-18

18 U.S.C. § 3583(e) ....................................................................... 22

18 U.S.C. § 3583(e)(3) .............................................................. 21, 27-28

28 U.S.C. § 1291 ............................................................................. 1

Fed. R. App. P. 4(b)(1)(A)(i) ........................................................... 1

Fed. R. App. P. 4(b)(2) ................................................................... 1

## TABLE OF CITATIONS – (cont'd)

**Page**

## STATUTES AND RULES – (cont'd)

Rule 28.2.1 ................................................................................................ i

Tex. Penal Code § 12.21 .......................................................................... 39

Tex. Penal Code § 12.22 .......................................................................... 40

Tex. Penal Code § 12.35(a) ...................................................................... 39

Tex. Penal Code § 16.01 ..................................................................... 29, 33

Tex. Penal Code § 16.01(a) ................................................................ 20, 29

Tex. Penal Code § 16.01(a)(1) ........................................................... 29, 40

Tex. Penal Code § 16.01(a)(2) ........................................................... 29, 40

Tex. Penal Code § 16.01(b) ................................................................ 20, 29

Tex. Penal Code § 16.01(b)(1) ...................................................... 29-30, 32

Tex. Penal Code § 16.01(b)(2) ............................................................ 29-30

Tex. Penal Code § 16.01(c) ...................................................................... 40

Tex. Penal Code § 29.04(b) ...................................................................... 40

Tex. Penal Code § 30.04(d) ...................................................................... 40

## SENTENCING GUIDELINES

USSG § 7B1.1(a)(2) ................................................................................. 39

USSG § 7B1.1(a)(3) ............................................................................ 39, 41

**TABLE OF CITATIONS – (cont'd)**

**Page**

**SENTENCING GUIDELINES – (cont'd)**

USSG § 7B1.1(b) ............................................................... 26, 35

USSG § 7B1.3(a) ............................................................... 36, 42-43

USSG § 7B1.3(a)(1) ............................................................... 43

USSG § 7B1.4 ............................................................... 43

USSG § 7B1.4(a) ............................................................... 26-27, 35, 41

USSG § 7B1.4(b)(1) ............................................................... 17, 27

## STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked under 28 U.S.C. § 1291, as an appeal from a final judgment upon revocation of supervised release and sentence in the United States District Court for the Southern District of Texas.

The judgment appealed from was entered on the docket on August 28, 2025. Mr. Prejean previously filed notice of appeal on August 25, 2025, after the announcement of judgment and sentence on August 19, 2025. The appeal is timely. *See* Fed. R. App. P. 4(b)(1)(A)(i), (b)(2).

**STATEMENT OF THE ISSUES**

**ISSUE ONE:** Whether the district court reversibly erred by finding that the evidence was sufficient for Violation 3 and basing its revocation sentence on that finding and an incorrect, higher Chapter 7 Guidelines range.

**ISSUE TWO**: Whether the district court reversibly erred by basing its revocation sentencing decision in part on Violation 1, for which the evidence was insufficient.

**ISSUE THREE**: Whether the district court plainly erred by classifying Violation 1 as a Grade B violation.

## STATEMENT OF THE CASE

### A.    The original sentence and first revocation.

On February 15, 2022, in the United States District Court for the Eastern District of Texas, Defendant-Appellant Jarrod Prejean was sentenced to serve 30 months in the custody of the Bureau of Prisons, to be followed by a three-year term of supervised release, in connection with his guilty-plea conviction for conspiracy to transport stolen electronics in interstate commerce, in violation of 18 U.S.C. § 371 and § 2314. ROA.9-10. Mr. Prejean was released from custody and began his term of supervised release. Effective January 31, 2024, jurisdiction over his supervised release was transferred to the United States District Court for the Southern District of Texas. ROA.8.

On April 1, 2024, the district court found that Mr. Prejean had violated the conditions of his supervised release by associating with a convicted felon or person engaged in criminal activity, leaving the judicial district without permission, and failing to pay the $100 special assessment. ROA.42. The court revoked Mr. Prejean's supervised release and sentenced him to serve 8 months in the custody of the Bureau of Prisons, to be followed by a 16-month term of supervised release.  ROA.43-44. The conditions of supervised release included the mandatory condition to not commit another federal, state, or local crime and the standard condition to notify the

probation officer within 72 hours of an arrest. ROA.44. On November 27, 2024, Mr. Prejean recommenced his term of supervised release. ROA.46.

**B.    The instant revocation proceedings.**

On July 22, 2025, the district court ordered the issuance of a warrant for Mr. Prejean's arrest in connection with the probation office's petition to revoke his supervised release. ROA.50-53. The petition alleged two violations: (1) on or about June 24, 2025, committing the felony of possession/unlawful use of a criminal instrument ("Violation 1") and (2) not notifying probation within 72 hours of his arrest on or about June 24, 2025 ("Violation 2"). ROA.51-52. On July 31, 2025, Mr. Prejean was arrested and made his initial appearance on the petition, and the Federal Public Defender was appointed to represent him. ROA.74-77. On August 13, 2025, the probation office filed a superseding petition to revoke Mr. Prejean's supervised release. ROA.180-184. The petition added a third alleged violation that Mr. Prejean had committed the felony of aggravated robbery on or about May 6, 2025, by "threaten[ing] the victim with a firearm." ("Violation 3"). ROA.182-183. At the final revocation hearing on August 19, 2025, Mr. Prejean pleaded not true to the alleged violations. ROA.85-89.

*1. Violation 1*

The government attempted to prove Violation 1 through the testimony of Houston Police Department Lieutenant Christian Darton. ROA.89-115. He testified

that he had been with the Houston Police Department for about 17 years and had spent about 10 years as part of the Northeast Tactical Unit, which investigated bank juggings as one of its primary responsibilities. ROA.89-90. He explained that a jugging occurs when "[p]eople sit in front of a bank," "watch people come out with their money," follow them, and rob them. ROA.91. "If the people don't have the money on them, and they leave it in their vehicle, they break into their cars and steal the money." ROA.91. Rental cars with front license plates removed are commonly used in juggings. ROA.91-92.

On June 24, 2025, Lieutenant Darton encountered Mr. Prejean in the parking lot of an Amegy Bank. ROA.93. Lieutenant Darton was off duty and had driven into the bank parking lot thinking it would be a good place to eat his tacos from Taco Bell. ROA.93. He had known Jarrod Prejean since he was 12 or 13 years old. ROA.93. He saw a vehicle with the front license plate removed that was backed into a parking spot in front of the bank. ROA.93. The vehicle had an EZ Tag on Velcro, which let him know it was a rental vehicle. ROA.94. A man later identified as Paul Prejean was in the driver's seat. ROA.94. Jarrod was in the rear passenger seat, then shifted to the rear center. ROA.94. Government Exhibit ("GX") 1 depicted the vehicle with no front license plate. ROA.94-95; GX 1. Lieutenant Darton thought this vehicle was consistent with jugging because it was parked in front of a bank, "backed in with a clear view of the front doors," and the front plate had been

5

removed. ROA.95. Later on, duct tape was found in the vehicle, which would also "be consistent with covering up th[e] rear plate prior to committing the jugging offense." ROA.96.

Lieutenant Darton got out of his vehicle and planned to just tell them to leave, since he had not caught them "where there's anything to do" and he was not prepared to take them into custody. ROA.96. But then the driver Paul threw his keys at him and ran away. ROA.96-97. Jarrod stayed in the vehicle and was cooperating and complying. ROA.97. Lieutenant Darton told him he was detained. ROA.97. He also told him to get Paul to come back and get his keys. ROA.97. Lieutenant Darton grabbed his radio and "called it out to Central." ROA.97. Jarrod "took off, too." ROA.97. Other officers arrived, got Jarrod into custody, and brought him back. ROA.97. They did not find Paul. ROA.97.

They conducted an inventory of the vehicle. ROA.97. As depicted in GX 2, the front plate had been removed and was sitting on the front passenger seat, and cell phones had been left behind, one of which was Paul's and had his face on the lock screen. ROA.97-98. There was also "the spring-loaded window punch" sitting in the center console. ROA.98. In GX 3, Lieutenant Darton identified a hoodie, gloves, and duct tape that were in the back seat with Jarrod. ROA.98. The window punch looked like and could function as a cell phone charger, but it had a little metal spike that would eject when a button was clicked and could break the glass of a window.

ROA.98. A window punch can be purchased online, is sold as a security tool, and if a person is not "out there to commit a crime, it's not something that in and o[f] itself would normally be illegal, just like a hammer or a screw driver or a crow bar." ROA.99. Lieutenant Darton testified that, based on his training and experience and the totality of the circumstances, "they have taken that spring-loaded window punch and adapted it for use in crime, and so that, in and of itself would be a criminal instrument." ROA.99-100. Although typically that would be a misdemeanor, "the Harris County DA's Office sought to file it as a felony for them adapting and modifying the vehicle for use as well" by removing the front license plate. ROA.99-100.

After Jarrod had been detained, he was frustrated about going to jail. ROA.100. Lieutenant Darton learned he was on federal supervised release. ROA.100. Jarrod became agitated when Lieutenant Darton wanted to take pictures of "his gang tattoos and some other tattoos related to his prior robberies." ROA.100. Jarrod made a comment at some point, either "before or after the handcuffs," along the lines of "man, like, you ain't catch us doing it; like, just 'cause you caught us at the bank, you know, you didn't catch us actually, like, you know, hitting a lick." ROA.100. About an hour later, someone let Lieutenant Darton know that Paul had successfully evaded arrest and was Jarrod's cousin. ROA.101. Paul was later

identified "as being a part of some . . . robberies and involved in it as well." ROA.101.

On cross-examination, Lieutenant Darton testified that he did now know how long the vehicle had been at the Amegy Bank, he did not obtain surveillance footage from the bank, and he did not know if Jarrod or Paul had conducted business at the bank. ROA.106-107. Lieutenant Darton did not receive any evidence that day that bank patrons were being followed by the vehicle. ROA.108.

Lieutenant Darton identified himself holding the window punch/car charger in the photograph admitted as Defense Exhibit ("DX") 1. ROA.109-110. He testified that the window punch/car charger had two USB ports and was "very similar, if not the same," as the car charger shown in DX 2 and 3. ROA.110-111. Both had a red ring around the charging port. ROA.111; DX 2. Lieutenant Darton further testified that the charger in DX 2 and 3 was available on Amazon for $19.99 and that "[t]hese are things that they sell in all types of stores. In an[d] of itself, the item isn't illegal." ROA.111. Lieutenant Darton agreed that the charger was "an emergency device" that could be used to cut a seatbelt if a person was stuck underwater in their vehicle and to punch out the vehicle's window to escape. ROA.111.

Lieutenant Darton had no record showing that the window punch/car charger belonged to Jarrod or that he had purchased it. ROA.112. It was not found on Jarrod, but Lieutenant Darton thought it was "within his wingspan reach." ROA.112. In the

vehicle, the window punch/car charger was located under the gear shift. ROA.114-115. Jarrod was in the back seat of the vehicle, which was a mid-size SUV. ROA.115. The vehicle was a rental, and Lieutenant Darton could not say who had rented it. ROA.115.

### 2. *Violation 2*

For Violation 2, the government offered only the testimony of U.S. Probation Officer Auzuree Jackson, who testified that she had no record that Mr. Prejean had reached out to probation after his arrest on June 24, 2025, but she was not his probation officer. ROA.116-119. Later on, the district court called U.S. Probation Officer Jared Shaw, who had been Mr. Prejean's probation officer. ROA.158-159. Mr. Prejean does not challenge Violation 2 on appeal.

### 3. *Violation 3*

For Violation 3, the government called only Pflugerville Police Department Detective Andrew Carpenter. ROA.120-149. Detective Carpenter testified that he was assigned to the Criminal Investigations Division and had been with the Pflugerville Police Department for just over two years. ROA.120-121. On May 6, 2025, the Pflugerville police responded to an apartment complex after receiving a call that someone had had her money stolen that she had just withdrawn from a Bank of America in Austin, along with her cell phone and wallet. ROA.121-122. The officers' investigation showed that she had withdrawn $6,000 and was followed out

of the bank parking lot by two vehicles. ROA.122. When she arrived at home, a suspect parked behind her, opened her car door, saw the money, and showed what she reported to be a firearm in his waistband. ROA.122. She felt fear, froze, and didn't know what to do. ROA.122. The suspects fled in the vehicle with her property. She said she believed the vehicle involved in the robbery was a silver Dodge sedan. ROA.122. Detective Carpenter did not think that was accurate based on his investigation. ROA.122-123.

Detective Carpenter identified the two suspect vehicles as a Toyota Highlander, an Enterprise rental car with license plate TFM 9100, and a gray Ford Escape, an Avis rental car with license plate TXP 2216. ROA.123-124; GX 4-5. Detective Carpenter identified these vehicles as involved in the robbery by reviewing the Bank of America security footage of the bank parking lot and license plate reader camera footage. ROA.125. Both vehicles were rented in the Houston area. ROA.125. Detective Carpenter did some investigation of how the vehicles went from Houston to Pflugerville using license plate readers along the way. ROA.125-126. He also obtained a search warrant for the vehicles. ROA.126. Smart vehicles connect to towers as they're driving, and so he was able to see about what time they left Houston, the path they took, and how they came into Pflugerville. ROA.126. Pflugerville is about 2 ½ to 3 hours from Houston, about 20 minutes northwest of Austin, Texas. ROA.126.

Detective Carpenter determined that Jachel Simmons had rented the Toyota Highlander. ROA.126. He obtained a search warrant for her phone detail records from the time she rented the car until she returned it, and looked at the top people with whom she communicated. ROA.126-127. One of the numbers ended in 8345, and he noticed irregularities in that she dialed star 6-7 when she called that number, which would cause her number to show up as restricted or blocked on the other phone. ROA.127. If the receiving phone was searched, that phone would not show who had called. ROA.127. Records from the phone carrier, however, showed the phone number. ROA.127-128. Detective Carpenter ran that phone number through various law enforcement databases to try to find out who it might belong to, and also plugged it into Cash App and came up with an account named Money Motivess 1 and the name of Jarrod Prejean. ROA.128; GX 6. The person joined Cash App in December 2022. ROA.128.

Detective Carpenter then searched databases for a driver's license photo for that name and found one. ROA.129-130; GX 9-10. He compared that photo with the video footage of a person stepping out of a vehicle at an H-E-B fuel pump before the robbery. ROA.129. From surveillance footage, the Toyota Highlander went from the Bank of America and pulled into the H-E-B fuel pumps. ROA.129. The passenger exited the vehicle, walked over to the cashier stand, made a cash purchase, got back into the vehicle, and the vehicle drove off. ROA.129; GX 7-8. Detective Carpenter's

11

database search also returned another image associated with the name Jarrod Prejean. ROA.130; GX 9. Detective Carpenter thought the male on the far right of GX 9 looked like the driver, based on another image of the driver stepping out of the vehicle at the H-E-B fuel pumps, making a purchase, and then driving back to the Bank of America. ROA.130. Detective Carpenter believed the suspect was Jarrod Prejean. ROA.130.

Detective Carpenter showed GX 7 to Lieutenant Darton as part of his investigation. ROA.131. The prosecutor then asked if Lieutenant Darton "confirm[ed] that that was the Defendant," which drew an objection from counsel for Mr. Prejean. ROA.131. The court asked if this was in the affidavit, and the prosecutor responded, "it's based on Detective Carpenter's belief. We just met this morning, and Lieutenant Darton confirmed it was him. I should have asked that. I can bring him back up and ask that one question, but – . . . we can move on, too, Your Honor." ROA.132. The court asked, "do you need it?" and the prosecutor responded, "I think we're good." ROA.132. Detective Carpenter did not answer the question, and the prosecutor never re-called Lieutenant Darton.

Detective Carpenter obtained a warrant for the 8345 phone number that communicated with Jachel. ROA.132. He believed that the device belonged to Jarrod Prejean and left Houston at the same time as the Toyota Highlander. ROA.132-133. Detective Carpenter searched for any criminal history or pending warrants for

Mr. Prejean and found an arrest out of Houston and that he was a suspect in a Wisconsin jugging. ROA.133. No one had asked the robbery victim to identify Mr. Prejean in a lineup or photo array. ROA.133.

On cross-examination, Detective Carpenter testified that there was no surveillance footage of the robbery. ROA.134. He had not interviewed the robbery victim and had not interviewed any of the suspects. ROA.134-135. The robbery happened on May 6, 2025, at about 4:00 pm. ROA.135. The day of the robbery, the victim gave descriptions of the person who showed the gun and took the money, the vehicle, and the passenger who stayed in the vehicle. ROA.135-136. She described the vehicle as a gray Dodge, similar shape to a Ford Mustang, with no license plate. ROA.136. She described the person with the gun as a black male with short black hair, a goatee, medium build, a bigger stomach, and 5'6". ROA.136-137. She did not say that the suspect had any sort of tattoos. ROA.137. She further described him as wearing clear sunglasses, a muscle shirt, and blue jeans. ROA.137. She described the passenger in the gray car as having dark skin, braided hair, no beard, thin build, blue T-shirt, and no glasses. ROA.137-138. Someone from the leasing office was the person who called the police, and she described the robber as a heavyset black man wearing a black muscle tank. ROA.138. Detective Carpenter agreed that Mr. Prejean is about 6'2", did not have a belly, and had lots of tattoos. ROA.138-

13

139. Mr. Prejean did not match the description the victim provided, and the victim had not picked him out of a lineup or a photo array. ROA.139.

Three other people had been charged in the robbery so far, and none of them had pointed the finger at Mr. Prejean or implicated him in any way. ROA.139. Fingerprints were collected from the victim's car and had been sent to the lab, but there was a two-year delay for results and so those prints had not been matched to Mr. Prejean. ROA.140. Detective Carpenter had not seen Mr. Prejean in person before the revocation hearing and became familiar with him only through investigating the May 2025 robbery and looking at pictures. ROA.140-141.

Detective Carpenter in his review of surveillance footage did not see the Mustang that the victim described, and neither the Highlander or Edge look like a Mustang. ROA.141. Mr. Prejean did not rent or own the Edge. ROA.141. Detective Carpenter had not spoken to the person who rented the Edge and did not ask who the renter had allowed to use it. ROA.141-142. Detective Carpenter believed that the person who was using the Edge was Christopher Harris, who was pulled over in Grand Prairie with a passenger named Courtland Hampton. ROA.142. In his report, Detective Carpenter noted that Hampton looked like the passenger who got out of the Highlander at the H-E-B gas station. ROA.143.

Mr. Prejean didn't rent the Highlander, either, and Detective Carpenter also had not talked to the person who rented that car. ROA.143. The passenger who exited

the Highlander at the H-E-B was wearing a red shirt, black pants, and black shoes. ROA.143-144. The robbery victim did not describe that clothing. ROA.144. When asked if there were any discernible tattoos on the Highlander passenger at the H-E-B, Detective Carpenter testified that the security footage would not pick up fine detail like tattoos but believed he could kind of see tattoos in GX 8. ROA.144.

Detective Carpenter believed the people in the Highlander and Edge were working together, which would require communication. ROA.144. He did not find any phone calls or text messages between the phones searched in his investigation, but communication through apps or walkie-talkies would not be in the phone records he had obtained. ROA.145-146.

Detective Carpenter submitted a subpoena to T-Mobile for the 8345 phone number. ROA.146. The number was not registered to Mr. Prejean. ROA.146. Detective Carpenter had not talked to Jachel, the person to whom the phone number was registered. ROA.146. Detective Carpenter did not know who was actually using the phone with the 8345 number. ROA.146-147. As for the Cash App account, to create an account, a person has to link an e-mail or phone number, and in this case the Cash App account could have been linked to the 8345 number when it was created in 2022. ROA.147.

Detective Carpenter did not have any receipt, such as from a credit card transaction, showing that Mr. Prejean bought something in Pflugerville. ROA.147-

148. He did not have any better quality security footage than GX 7 and 8. ROA.148. He only had the security footage from the H-E-B. ROA.148. The $6,000 that was taken from the victim had not been recovered. ROA.148. Detective Carpenter did not have any evidence that Mr. Prejean made an elaborate purchase after the robbery, nor was he aware of any post on social media with a bunch of money. ROA.148. The victim's debit cards were also taken, and Detective Carpenter did not have any evidence that Mr. Prejean had used those debit cards. ROA.148-149. The government rested. ROA.149. The defense did not call any witnesses. ROA.149.

### 4.  *Arguments and the district court's rulings*

The government argued that it had met its burden on all three violations and recommended a sentence of two years' imprisonment, with no supervised release to follow. ROA.149-151, 156-157. Counsel for Mr. Prejean requested that the court find all three violations to be not true. ROA.152. For Violation 1, counsel argued that the "car charger in and of itself is not a criminal instrument. It is a car charger, a safety emergency device, available on Amazon for $19.99," and that the evidence was insufficient to show that it was a criminal instrument under Texas case law, including "specifically in *Medina v. State*."[1] ROA.152-155. For Violation 3, counsel also argued that the evidence was insufficient, including because "the alleged victim

---

[1] 411 S.W.3d 15 (Tex. App.–Houston [14th Dist.] 2013, no pet.).

describe[d] someone who is a wholly different human being than Mr. Prejean." ROA.155-156.

The court found that all three violations were true. ROA.159. The government and Mr. Prejean declined the district court's offer to make a statement before it imposed sentence. ROA.159-160. Counsel for Mr. Prejean asked for the sentence to run concurrently to the pending and potential future state cases, a "slight deviation" from the Sentencing Guidelines recommendation of 24 months, and no supervised release to follow. ROA.160.

The court noted that it had "reviewed the Revocation worksheets and the Chapter VII policy statements in this matter." ROA.160.  The court explained that "the statutory maximum term of imprisonment in this case is two years. According to the Chapter VII computations, the revocation imprisonment range for a criminal history category of 6 and a Grade A violation is 24 months, pursuant to Section 7B1.4(b)(1)." ROA.160-161. The court then said, "Sir, after considering the Chapter VII policy statements, the Court revokes your term of supervised release and sentences you to the statutory maximum of 24 months['] imprisonment with no supervised release to follow." ROA.161. The court noted that the sentence was "imposed pursuant to the Chapter VII policy statements and address[ed] the Sentencing objectives of punishment and deterrence in accordance with 18 U.S.C., Section 3553(c) [*sic*]." ROA.161. The court ordered the sentence "to run

consecutively to any sentence that may be imposed in regards to alleged state law violations that are subject to the Revocation hearing." ROA.161. The court again noted that the sentence was "imposed pursuant to the Chapter VII policy statements and address[ed] the Sentencing objectives of punishment and deterrence in accordance with 18 U.S.C., Section 3553(c) [*sic*]." ROA.161-162.

## C.    The appeal.

On August 25, 2025, Mr. Prejean timely filed notice of appeal. *See* ROA.60-61; *see also* ROA.64 (judgment entered on August 29, 2025). On appeal, he argues that (1) the evidence was insufficient as to Violation 3, (2) it was also insufficient for Violation 1, and (3) Violation 1 was misclassified.

## SUMMARY OF THE ARGUMENT

**ISSUE ONE**: The government failed to present sufficient evidence that Mr. Prejean committed Violation 3, which alleged that he committed an aggravated robbery. No evidence placed Mr. Prejean at the apartment complex where the victim was robbed. The victim and the leasing agent who called the police described other people. The three other suspects charged with the robbery had not implicated Mr. Prejean in any way. The government's own witness identified another suspect as the person in the surveillance images of the Highlander's passenger at the H-E-B fuel pumps. The Highlander was rented by Jachel Simmons, not Mr. Prejean, and the government did not present any evidence of a connection between Jachel and Mr. Prejean. Although the government linked the 8345 phone number to a Cash App account with the name Jarrod Prejean, that account was created in December 2022, the government's witness admitted that he did not know who was actually using the phone, the phone was registered to Jachel, and the government did not present any evidence from the phone records showing that Mr. Prejean was using the phone or that the phone had been used to communicate with the people in the Edge.  Because the government presented insufficient evidence, the district court erred by finding that Mr. Prejean committed Violation 3. That finding led the district court to impose a sentence based on a higher, incorrect Guidelines range under the Chapter 7 policy

19

statements, which constitutes a plain procedural error. The Court should, therefore, remand for resentencing using the correct, lower range.

**ISSUE TWO**: The district court reversibly erred by basing its revocation sentencing decision in part on Violation 1, for which the evidence was insufficient. The government failed to provide sufficient evidence that the window punch/car charger met the statutory definitions in Texas Penal Code § 16.01(b). Nor did the government sufficiently prove the other elements of Texas Penal Code § 16.01(a). Since the government did not sufficiently prove Violation 1, the district court plainly erred by factoring that violation into its sentencing decision. On the record in this case, the government will not be able to meet its burden to show harmless error, and the Court should remand for resentencing without consideration of Violation 1. Alternatively, if the Court agrees with Mr. Prejean's arguments in Issues One and Two, the Court should vacate the district court's revocation judgment and remand for further proceedings, including for the district court to decide in the first instance whether to revoke Mr. Prejean's supervised release based only on Violation 2.

**ISSUE THREE**: Mr. Prejean raises this issue but only if the Court agrees with his argument on Issue One but not Issue Two. In that case, the district court plainly erred by classifying Violation 1 as a Grade B violation, the error affected Mr. Prejean's substantial rights, and it should be corrected by this Court by vacating the district court's revocation judgment and remanding for further proceedings.

## ARGUMENT

**ISSUE ONE RESTATED**: The district court reversibly erred by finding that the evidence was sufficient for Violation 3 and basing its revocation sentence on that finding and an incorrect, higher Chapter 7 Guidelines range.

### A.    Standard of review.

A district court may revoke a term of supervised release if it "finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). This Court "review[s] for abuse of discretion a decision to revoke supervised release." *United States v. Minnitt*, 617 F.3d 327, 332 (5th Cir. 2010) (quoting *United States v. McCormick*, 54 F.3d 214, 219 (5th Cir. 1995)).

When, as here, "a defendant preserves his objection for appeal, [the Court] review[s] a sentence imposed on revocation of supervised release under a 'plainly unreasonable' standard." *United States v. Foley*, 946 F.3d 681, 685 (5th Cir. 2020) (quoting *United States v. Warren*, 720 F.3d 321, 326 (5th Cir. 2013)). "Under this standard, [the Court] first 'ensure[s] that the district court committed no significant procedural error, such as failing to consider the [relevant 18 U.S.C.] § 3553(a) factors [or] selecting a sentence based on clearly erroneous facts . . . .'" *Id.* (quoting *Warren*, 720 F.3d at 326). The Court "then consider[s] 'the substantive reasonableness of the sentence imposed.'" *Id.* (quoting *United States v. Winding*, 817 F.3d 910, 913 (5th Cir. 2016)).

One factor that district courts must consider is "the non-binding policy statements found in Chapter Seven of the Sentencing Guidelines Manual." *United States v. McKinney*, 520 F.3d 425, 427-28 (5th Cir. 2008) (citing 18 U.S.C. § 3583(e)). Although advisory, a district court must "correctly calculat[e] the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). A district court commits plain procedural error if it miscalculates the advisory range under the Chapter 7 policy statement. *See United States v. Mims*, 992 F.3d 406, 408-09 (5th Cir. 2021).

**B.     The evidence was insufficient as to Violation 3.**

The government failed to offer sufficient evidence to prove by a preponderance of the evidence that Mr. Prejean committed Violation 3, the aggravated robbery. No evidence placed Mr. Prejean at the apartment complex where the victim was robbed. There was no surveillance footage of the robbery. ROA.134. The day of the robbery, the victim gave descriptions of the person who showed the gun and took the money and the passenger who stayed in the vehicle, but those descriptions did not match Mr. Prejean. ROA.135-136, 139. She described the person with the gun as a black male with short black hair, a goatee, medium build, a bigger stomach, and 5'6". ROA.136-137. She did not say that the suspect had any sort of tattoos. ROA.137. She further described him as wearing clear sunglasses, a muscle shirt, and blue jeans. ROA.137. She described the passenger in

the gray car as having dark skin, braided hair, no beard, thin build, blue T-shirt, and no glasses. ROA.137-138. Detective Carpenter agreed that Mr. Prejean is about 6'2", did not have a belly, and had lots of tattoos. ROA.138-139. The victim had never picked Mr. Prejean out of a lineup or a photo array. ROA.133, 139.

Someone from the leasing office was the person who called the police, and she described the robber as a heavyset black man wearing a black muscle tank. ROA.138. That description also did not match Mr. Prejean.

The victim also gave a description of the vehicle the day of the robbery, and that description was a silver or gray Dodge sedan, similar shape to a Ford Mustang, with no license plate. ROA.122, 135-136. Like her physical descriptions of the robber and passenger, that vehicle description did not match the Highlander or the Edge—neither of those vehicles look like a Mustang. ROA.141.

Three other people had been charged in the robbery so far, and none of them had pointed the finger at Mr. Prejean or implicated him in any way. ROA.139. Fingerprints were collected from the victim's car and had been sent to the lab, but there was a two-year delay for results and so those prints had not been matched to Mr. Prejean. ROA.140.

Nor did the government prove by a preponderance of the evidence that Mr. Prejean exited the Highlander at the H-E-B fuel pumps. Detective Carpenter did not have any receipt, such as from a credit card transaction, showing that Mr. Prejean

bought something in Pflugerville,. ROA.147-148. He did not have any better quality security footage than GX 7 and 8. ROA.148. But in his report, Detective Carpenter noted that the person in GX 7 and 8, the passenger who got out of the Highlander at the H-E-B gas station, looked like Courtland Hampton. ROA.142-143. Courtland Hampton was a passenger in the Edge that was being driven by Christopher Harris when it was pulled over in Grand Prairie. ROA.142.

The government did not provide a photograph of Courtland Hampton to the district court. Although the government asked Detective Carpenter if Lieutenant Darton had "confirm[ed]" that the person in GX 7 "was the Defendant," counsel for Mr. Prejean objected before he could answer. ROA.131. After an exchange with the court, the prosecutor moved on without having Detective Carpenter answer the question. ROA.132. The government did not re-call Lieutenant Darton. Of course, the prosecutor's question and unsworn statements are not evidence. *See, e.g.*, *United States v. Luna-Gonzalez*, 34 F.4th 479, 480 (5th Cir. 2022) (citing *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007)).

The Highlander was rented by Jachel Simmons, and during the time of the car rental, she communicated on her cell phone with a number ending in 8345 after dialing star 6-7 so that her phone number would show up as restricted or blocked on the other phone. ROA.126-127. Although Detective Carpenter linked the 8345 number to a Cash App account named Money Motivess 1 and the name Jarrod

24

Prejean, the account was created in December 2022. ROA.128; GX 6. The government did not present any evidence of activity on the account. Detective Carpenter submitted a subpoena to T-Mobile for the 8345 phone number. ROA.146. The number was registered to Jachel, not Mr. Prejean. ROA.146. Detective Carpenter had not talked to Jachel and did not know who was actually using the phone with the 8345 number. ROA.146-147. The government did not provide any evidence of a connection between Jachel and Mr. Prejean, nor did the government provide any evidence from the phone records showing that Mr. Prejean was the person using the phone. The government had no evidence that the 8345 number had communicated by call or text message with the other suspects, including the people in the Edge. ROA.144-146.

The $6,000 that was taken from the victim had not been recovered. ROA.148. Detective Carpenter did not have any evidence that Mr. Prejean made an elaborate purchase after the robbery, nor was he aware of any post on social media with a bunch of money. ROA.148. The victim's debit cards were also taken, and Detective Carpenter did not have any evidence that Mr. Prejean had used those debit cards. ROA.148-149.

Even though the preponderance standard sets a lower bar than beyond a reasonable doubt, the government's evidence in this case did not clear it. The district court erred by finding that Mr. Prejean committed Violation 3.

## C.    Without Violation 3, the Guidelines range would have been lower.

The district court used Violation 3, the most serious violation, to calculate the advisory Guidelines range under the Chapter 7 policy statement. That range would have been lower without the court's error of relying on unproven Violation 3.

The Guidelines instruct that, "[w]here there is more than one violation of the conditions of supervision, . . . the grade of the violation is determined by the violation having the most serious grade." USSG § 7B1.1(b).[2] The Revocation Table sets forth the range of imprisonment applicable upon revocation based on the most serious grade of violation and the criminal history category "applicable at the time the defendant originally was sentenced to a term of supervision." USSG § 7B1.4(a).

In this case, the Judge's Sentencing Options Worksheet ("JSOW"), which the district court considered at sentencing, ROA.160-161, classified Violation 1 as Grade B, Violation 2 as Grade C, and Violation 3 as Grade A, and so identified the most serious grade of violation as A. JSOW at 1-2.[3] Mr. Prejean's original criminal history category was VI, ROA.161, and so the Guidelines range with Violation 3 as the most serious, Grade A violation, was 33 to 41 months' imprisonment. USSG § 7B1.4(a) (Revocation Table). However, that range was reduced to 24 months'

---

[2] All references to the Guidelines in this brief are to the 2024 Guidelines Manual.

[3] The JSOW was not provided to undersigned counsel with the other parts of the record on appeal. Thus, for purposes of this brief, the JSOW is cited as: "JSOW at [page #]."

imprisonment, since that was "the statutorily authorized maximum term of imprisonment that [was] imposable upon revocation." USSG § 7B1.4(b)(1); *see also* 18 U.S.C. § 3583(e)(3) (setting a two-year statutory maximum term of imprisonment upon revocation of supervised release in connection with a Class D felony).

Without Violation 3, the most serious violation would have been Violation 1, a Grade B violation. *See* JSOW at 1. The original criminal history category of VI combined with a Grade B violation would have yielded a Guidelines range of 21 to 27 months' imprisonment, capped at the statutory maximum of 24 months. *See* USSG § 7B1.4(a), (b)(1). During the district court's brief explanation when imposing the 24-month sentence, the court expressly considered the incorrect, higher "range" of 24 months, repeatedly mentioned the Chapter 7 policy statements, and gave no indication that it would have imposed the same sentence if it had not found Violation 3 to be true and had considered the lower range to 21 to 24 months. *See* ROA.160-162. Accordingly, the district court imposed a plainly unreasonable sentence by relying on Violation 3 and the higher, incorrect range. *See Mims*, 992 F.3d at 408-09. The Court should, therefore, remand for resentencing using the lower range.

27

**ISSUE TWO RESTATED**: The district court reversibly erred by basing its revocation sentencing decision in part on Violation 1, for which the evidence was insufficient.

## A.    Standard of review.

As noted above, a district court may revoke a term of supervised release if it "finds by a preponderance of the evidence that the defendant violated a condition of supervised release," and this Court reviews that decision for an abuse of discretion. 18 U.S.C. § 3583(e)(3); *Minnitt*, 617 F.3d at 332 (citation omitted). When, as here, "a defendant preserves his objection for appeal, [the Court] review[s] a sentence imposed on revocation of supervised release under a 'plainly unreasonable' standard," and a district court commits a plain procedural error if it "select[s] a sentence based on clearly erroneous facts." *Foley*, 946 F.3d at 685 (citations omitted).

When the revocation of supervised release is supported by the violation of one condition, this Court "[o]rdinarily" does not need to review alleged errors regarding other violations. *United States v. Santos*, 624 Fed. Appx. 232, 233 (5th Cir. 2015) (unpublished) (citing *McCormick*, 54 F.3d at 219 n.3); *United States v. Soliz*, 344 Fed. Appx. 900, 901 (5th Cir. 2009) (unpublished) (same). However, that ordinary rule does not apply where, as here, the district court's findings on another violation affected or influenced the sentence imposed. *Santos*, 624 Fed. Appx. at 233; *Soliz*, 344 Fed. Appx. at 901.

28

**B.    The evidence was insufficient as to Violation 1.**

The government failed to prove by a preponderance of the evidence that Mr. Prejean committed Violation 1, which alleged the possession or unlawful use of a criminal instrument. Texas Penal Code § 16.01 provides:

(a) A person commits an offense if:

> (1) the person possesses a criminal instrument or mechanical security device with the intent to use the instrument or device in the commission of an offense; or

> (2) with knowledge of its character and with the intent to use a criminal instrument or mechanical security device or aid or permit another to use the instrument or device in the commission of an offense, the person manufactures, adapts, sells, installs, or sets up the instrument or device.

(b) For the purpose of this section:

> (1) "Criminal instrument" means anything, the possession, manufacture, or sale of which is not otherwise an offense, that is specially designed, made, or adapted for use in the commission of an offense.

> (2) "Mechanical security device" means a device designed or manufactured for use by a locksmith to perform services for a customer who seeks entry to a structure, motor vehicle, or other property.

Here, the government failed to prove that the spring-loaded window punch that looked like and could function as a cell phone charger (the "Object") was a "criminal instrument" or a "mechanical security device." Taking the statute's second term first, that alternative can be quickly dispensed with because the government presented

zero evidence about locksmiths. *See* ROA.89-115 (testimony of Lieutenant Darton). Accordingly, the government did not prove that the Object was "a device designed or manufactured for use by a locksmith." Tex. Penal Code § 16.01(b)(2).

Nor did the government present sufficient evidence that the Object was a "criminal instrument." The plain language of the statutory definition requires, in relevant part, that the thing be "specially designed, made, or adapted for use in the commission of an offense." Tex. Penal Code § 16.01(b)(1). "The distinction between what does or does not constitute a criminal instrument under Section 16.01 is a synthesis of the peculiar design or adaptation of the device and the context of its use or possession because both bear on the element of intent." *Janjua v. State*, 991 S.W.2d 419, 425 (Tex. App.–Houston [14th Dist.] 1999, no pet.). The phrase "'specially' designed, made, or adapted" means that "the object must be a fundamental or critically important element in the commission of the intended offense." *Id.* at 426 n.13.

For example, the court affirmed a conviction for unlawful use of a criminal instrument when the evidence showed that a truck "contained several modifications or adaptations conducive to the criminal purpose of stealing diesel fuel." *Medina v. State*, 411 S.W.3d 15, 20 (Tex. App.–Houston [14th Dist.] 2013, no pet.). Among other things, the truck had "extended fuel tanks that could hold more than three times the original volume" and "a platform large enough to support a man lying down."

*Id.* at 21. Furthermore, "the extended fuel tanks were not supplying the truck with fuel; an additional fuel cell welded to the truck's headache rack was being used as its fuel source," and "the State's expert indicated that the extended tanks and the fuel cell were illegal and unsafe adaptations for legitimate trucking purposes." *Id.*

Likewise, the court held that a defendant's personal computer qualified as a criminal instrument when it was "[c]entral" to his scheme to sell and promote child pornography and had been "specifically 'adapted' for a criminal purpose in several ways." *Janjua*, 991 S.W.2d at 426. It had been "modified with the addition of a video capture card," which the defendant used to convert videos into still photographs. *Id.* Additionally, "numerous files had been created on the hard drive to organize and store pornographic images." *Id.* Of the hard drive's 268 megabytes of data files, 212 megabytes were image files, and "95 per cent were sexually oriented images, and approximately 40 per cent of those images depicted children engaged in sexual acts and various states of sexual arousal." *Id.* "Based upon the file structure, the contents of the hard drive, and equipment specially added to the computer, the State's expert testified that in his opinion the primary purpose of the instrument was 'to view, create, and distribute image files, primarily pornographic image files.'" *Id.* The court differentiated between the personal computer that had been "*specially* designed, made, or adapted for distributing child pornography" and other objects merely "*used* in the commission of the offense" but which would not fall within the statute,

31

including "the desk on which appellant's computer sat, the house in which it resided, or the automobile that transported appellant to and from the house." *Id.* at 426 n.13 (emphasis in original).

Here, the government's evidence fell well short of the sufficient evidence in *Medina* and *Janjua*. Lieutenant Darton testified that the Object had two USB ports and was "very similar, if not the same," as the car charger shown in DX 2 and 3. ROA.110-111. Lieutenant Darton further testified that the Object was available on Amazon for $19.99 and that "[t]hese are things that they sell in all types of stores. In an[d] of itself, the item isn't illegal." ROA.111. Lieutenant Darton agreed that the Object was "an emergency device" that could be used to cut a seatbelt if a person was stuck underwater in their vehicle and to punch out the vehicle's window to escape. ROA.111. The government presented no evidence that the Object had been "*specially* designed, made, or adapted for use in the commission of an offense." Tex. Penal Code § 16.01(b)(1) (emphasis added).

Lieutenant Darton's testimony indicates that he appeared to be mistaken about the law's requirements. His testimony implied that ordinary objects like a hammer, screw driver, or crow bar could be criminal instruments if possessed by someone intending to use them to commit a crime. *See* ROA.99 (explaining his view that, the Object, if possessed by a person who is not "out there to commit a crime, it's not something that in and o[f] itself would normally be illegal, just like a hammer or a

screw driver or a crow bar"). But the plain language of the statute and Texas courts require more. *See, e.g.*, *Medina*, 411 S.W.3d at 20-21; *Janjua*, 991 S.W.2d at 426 & n.13.

The government also failed to present sufficient evidence of the other elements of the offense, that either (1) Mr. Prejean "possesse[d]" the object "with the intent to use the instrument or device in the commission of an offense" or (2) he had "knowledge of its character and . . . the intent to use" it "or aid or permit another to use [it] in the commission of an offense" and "manufactures, adapts, sells, installs, or sets up the instrument or device." Tex. Penal Code § 16.01. The object was located in the center console of the front seat of the Highlander, a mid-size SUV. ROA.98, 115. Paul Prejean was the driver, and Mr. Prejean was in the back seat. ROA.94, 115. Although GX 3 shows a hoodie with the gloves, duct tape, and the Object on top, the Object was not found with those other items in the Highlander. The hoodie, gloves, and duct tape were in the back seat, while the Object was under the gear shift. ROA.114-115; GX 2 (depicting the vehicle's center console and gear shift). The government presented no evidence that Mr. Prejean, who was in the back seat and did not rent the Highlander, ROA.98, 126, 143, knew about the object's ability to break windows. Lieutenant Darton had no record that the Object belonged to Mr. Prejean or that he had purchased it. ROA.112. The Object looked like a phone charger and was "very similar, if not the same" as the object shown in DX 2 and 3,

a car charger available for purchase on Amazon for $19.99 and "all types of stores." ROA.111. For all of these reasons, the government's evidence was insufficient to prove that Mr. Prejean committed Violation 1.

**C.    The district court erred by factoring the unproven Violation 1 into its sentencing decision.**

Because the government presented insufficient evidence as to Violation 1, the district court plainly erred by factoring Violation 1 into its sentencing decision. This Court has expressly recognized that the "legal limits on the district court's sentence imposition discretion at revocation sentencing" include the "settled law that 'sentences based upon erroneous and material information or assumptions violate due process.'" *Warren*, 720 F.3d at 330-31 (brackets omitted) (quoting *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. Unit B Nov. 1981)). "That principle extends equally in revocation sentencing as it does in original sentencing; it is procedural error at revocation sentencing to 'select a sentence based on clearly erroneous facts.'" *Id.* at 331 (brackets omitted) (quoting *United States v. Kippers*, 685 F.3d 491, 497 (5th Cir. 2012)). The district court thus committed plain procedural error by selecting its revocation sentence based on a clearly erroneous fact, *i.e.*, that Mr. Prejean had committed Violation 1.

The Court should, therefore, remand for a resentencing hearing at which the district court does not consider Violation 1. On the record in this case, the government will not be able to carry its burden to prove that the error was harmless.

"An error is harmless if the proponent of the sentence (here, the [g]overnment) points to evidence in the record showing that 'the district court had a particular sentence in mind and would have imposed it, notwithstanding the error made.'" *United States v. Santos*, No. 23-20559, 2024 WL 4457455, at \*5 (5th Cir. Oct. 10, 2024) (unpublished) (quoting *United States v. Delgado-Martinez*, 564 F.3d 750, 752-53 (5th Cir. 2009)). The record demonstrates that the court's incorrect finding that Mr. Prejean committed Violation 1 affected or influenced the sentence imposed. *Santos*, 624 Fed. Appx. at 233; *Soliz*, 344 Fed. Appx. at 901. The district court imposed the statutory maximum revocation sentence, and it gave no indication that it would have imposed that same sentence had it not considered Violation 1. *See* ROA.160-162.

Alternatively, if the Court agrees with Mr. Prejean on Issues One and Two, the Court should vacate the district court's revocation judgment and remand for further proceedings, at a minimum for resentencing but also for a decision as to whether Mr. Prejean's supervised release should be revoked. Without Violations 1 and 3, the only remaining and most serious violation would be Violation 2, a Grade C violation. *See* JSOW at 1-2. In that case, the correct Chapter 7 imprisonment range (for a criminal history of VI and a Grade C violation) would be 8 to 14 months, instead of 24 months. *See* USSG § 7B1.1(b), 7B1.4(a) (Revocation Table). The district court plainly erred by imposing sentence in reliance on an incorrect, higher

range. *See Mims*, 992 F.3d at 408-09. At a minimum, therefore, a remand for resentencing using the lower, correct range is appropriate.

But the district court should also consider in the first instance whether to revoke Mr. Prejean's supervised release at all, based on merely a Grade C violation of failure to report an arrest within 72 hours. "[A]ppellate courts generally sit as courts 'of review, not first view.'" *Utah v. Su*, 109 F.4th 313, 320 (5th Cir. 2024) (citation omitted). And "[w]here, as here, the district court has not even exercised its discretion, there is nothing for this Court to review." *United States v. Terrell*, 983 F.2d 653, 656 (5th Cir. 1993). The Guidelines state that a district court "shall revoke . . . supervised release" upon finding a Grade A or B violation, but in the case of a Grade C violation, the Guidelines state only that a district court "*may* (A) revoke . . . supervised release; or (B) extend the term of . . . supervised release and/or modify the conditions of supervision." USSG § 7B1.3(a) (emphasis added).

The district court in this case did not give any indication that it would have revoked Mr. Prejean's supervised release based solely on a single Grade C violation. *See* ROA.160-162. That makes this case unlike others where this Court has found an error with respect to one violation to be harmless because it was "clear from the revocation hearing that the district court considered [the stipulated] Grade C violations . . . as sufficient to support revocation and imposition of sentence." *United States v. Seawright*, 703 Fed. Appx. 285, 291 (5th Cir. 2017) (unpublished); *see also*

36

*United States v. English*, 400 F.3d 273, 276 (5th Cir. 2005) (finding any error of relying on a state law violation committed a few days after the term of supervised release expired to be harmless because "the district court explicitly noted that the violations that occurred during the supervised release term were sufficient on their own to warrant revocation"). Accordingly, the Court should vacate the district court's revocation judgment and remand for further proceedings with the district court considering only Violation 2.

**ISSUE THREE RESTATED**: The district court plainly erred by classifying Violation 1 as a Grade B violation.

## A.    Standard of review.

Legal questions, such as the district court's interpretation of statutes and its interpretation and application of the Sentencing Guidelines, are reviewed de novo. *See McKinney*, 520 F.3d at 428; *United States v. Mathena*, 23 F.3d 87, 89 (5th Cir. 1994). In the absence of an objection below, however, the Court reviews under the plain-error standard, which has four prongs: "First, there must be an error that has not been intentionally relinquished or abandoned." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). "Second, the error must be plain—that is to say, clear or obvious." *Id.* "Third, the error must have affected the defendant's substantial rights, which in the ordinary case means he or she must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* (internal citation and quotation marks omitted). "Once these three conditions have been met, the court of appeals should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). "Even in the context of plain error, [the Court] consider[s] the 'error' prong de novo." *United States v. Anderson*, 559 F.3d 348, 354 (5th Cir. 2009) (citation and italics omitted), *overruled on other grounds by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024).

38

**B.     The district court clearly and obviously erred by classifying Violation 1 as a Grade B violation.**

The district court found that Mr. Prejean had committed a Grade A violation (Violation 3); a Grade B violation (Violation 1); and a Grade C violation (Violation 2). JSOW at 1. If the Court agrees with Mr. Prejean's argument in Issue One that the evidence for Violation 3 was insufficient but disagrees with his argument in Issue Two, then the Court should consider this alternative argument as to Violation 1: that the district court clearly and obviously erred by classifying Violation 1 as a Grade B violation.

Grade B violations are defined as "conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year." USSG § 7B1.1(a)(2). Grade C violations are defined as "conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision." USSG § 7B1.1(a)(3). The least serious felony classification in Texas is a state jail felony, the commission of which qualifies as a Grade B violation since it is punishable by "confinement in a state jail for any term of not more than two years or less than 180 days." Tex. Penal Code § 12.35(a). The most serious misdemeanor classification in Texas is a Class A misdemeanor, the commission of which qualifies as a Grade C violation since it is punishable by "confinement in jail for a term not to exceed one year." Tex. Penal Code § 12.21. The second most serious is a Class B misdemeanor, the commission

39

of which also qualifies as a Grade C violation since it is punishable by "confinement in jail for a term not to exceed 180 days." Tex. Penal Code § 12.22.

The statute establishing unlawful use of a criminal instrument as an offense provides that "[a]n offense under Subsection (a)(1) is one category lower than the offense intended" and that "[a]n offense under Subsection (a)(2) is a state jail felony." Tex. Penal Code § 16.01(c).  The government did not present any evidence that Mr. Prejean violated Subsection (a)(2) since it did not present any evidence that he was "a person [who] manufactures, adapts, sells, installs, or sets up the instrument or device." § 16.01(a)(2). That leaves the punishment for Subsection (a)(1)—"one category lower than the offense intended." § 16.01(c). Lieutenant Darton testified that, in his many years of experience investigating bank juggings, "[i]f the people don't have the money on them, and they leave it in their vehicle, they break into their cars and steal the money." ROA.91. Thus, the window punch/car charger would not be used to commit a robbery but rather a burglary of a vehicle.

Burglary of a vehicle is classified as a Class A misdemeanor. Tex. Penal Code § 30.04(d). [4] One category lower than a Class A misdemeanor is a Class B misdemeanor punishable by "confinement in jail for a term not to exceed 180 days." Tex. Penal Code § 12.22. Violation 1, therefore, should have been classified as a

---

[4] Texas did not establish the offense of "jugging" until September 1, 2025. *See* Tex. Penal § 29.04(b).

Grade C violation. *See* USSG § 7B1.1(a)(3). The district court clearly and obviously erred by finding otherwise. *See, e.g.*, *United States v. Cardona-Garcia*, No. 23-40301, 2024 WL 3833285, at *3-*4 (5th Cir. Aug. 15, 2024) (unpublished) (concluding that the district court's error was clear and obvious based on "a plain reading of the [relevant federal and state] statutes"); *United States v. Guillen-Cruz*, 853 F.3d 768, 772 (5th Cir. 2017) (finding an error to be "plain from the face of the relevant statutes and regulations").

## C.     The error affected Mr. Prejean's substantial rights.

If the Court agrees with Mr. Prejean's argument in Issue One, that would eliminate the most serious violation, the Grade A Violation 3. *See* JSOW at 1-2. Since Violation 2 was a Grade C violation, the elimination of Violation 3 would mean that the district court's misclassification of Violation 1 as a Grade B instead of a Grade C violation affected Mr. Prejean's substantial rights.

To establish an effect on substantial rights, the defendant must "'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Molina-Martinez*, 578 U.S. at 194 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76 (2004)). With only Grade C violations, the Guidelines range would have been 8 to 14 months' imprisonment. USSG § 7B1.4(a) (Revocation Table). The district court's statutory maximum sentence of 24 months represents a 71% percent increase from the top of that range. Moreover, as explained

above, the district court may not have elected to revoke Mr. Prejean's supervised release based solely on Grade C violations and instead may have "extend[ed] the term of . . . supervised release and/or modif[ied] the conditions of supervision." USSG § 7B1.3(a). The record shows that the district court relied on the higher, incorrect range based on a Grade A violation when imposing sentence, and the district court gave no indication about how it would have proceeded or the sentence it would have imposed if it had found only Grade C violations. *Cf. Molina-Martinez*, 578 U.S. at 201 (when "the record is silent as to what the district court might have done had it considered the correct Guidelines range, the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial right"); *see also Mims*, 992 F.3d at 409 (recognizing that the Court has applied *Molina-Martinez* "in cases involving revocation sentencing").

**D.    The error should be corrected by this Court because it seriously affects the fairness, integrity, and public reputation of judicial proceedings.**

Finally, the Court should correct the error because it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 135 (2018) (quoting *Molina-Martinez*, 578 U.S. at 194). To be clear, Mr. Prejean does not contend that this error should be corrected alone, but only if the Court finds insufficient evidence for Violation 3 and that Violation 1 should have been a Grade C violation. In that case, there is a "risk of unnecessary deprivation of liberty [that] particularly undermines the fairness, integrity, or public

42

reputation of judicial proceedings" in light of "the role the district court play[ed] in calculating the [Guidelines] range and the relative ease of correcting the error." *Id.* at 140. Without the combined errors, the revocation proceeding would have looked very different. The Chapter 7 Guidelines range would have been only 8 to 14 months, well below the two-year statutory maximum instead of well above it. *See* USSG § 7B1.4 (Revocation Table). Furthermore, both violations would have been Grade C violations, the least serious classification for which the Guidelines do not even mandate revocation. USSG § 7B1.3(a); JSOW at 1-2.

Although the Court declined to exercise its fourth-prong discretion in *Mims*, that case involved very different facts. There, the district court imposed a 21-month sentence after calculating the Chapter 7 Guidelines range as 15 to 21 months based on classifying the violation as Grade A, instead of Grade B. *Mims*, 992 F.3d at 408-09. Unlike in Mr. Prejean's case where only Grade C violations would be left absent the errors, the Guidelines policy statement mandates revocation in the case of both Grade A and B violations. USSG § 7B1.3(a)(1). Moreover, the district court in *Mims* "observed that the sentence it imposed was, if anything, lenient," and the violation worksheet noted "several aggravating factors that would justify an upward variance." 992 F.3d at 411. Neither of those facts are present in this case. Furthermore, *Mims* involved only a classification error, not an additional error of finding that a violation had been committed. *See id.* at 408 (explaining that Mims

43

had "pleaded guilty to access device fraud and pleaded true to violating her conditions of [supervised release]"). On the particular facts of Mr. Prejean's case, the Court should exercise its discretion to correct the district court's errors and remand for further proceedings, including whether to revoke Mr. Prejean's supervised release based only on Violations 1 and 2 as Grade C violations.

**CONCLUSION**

For the reasons stated in Issues One and Two, the Court should vacate the district court's revocation judgment and remand for further proceedings with the district court considering only Violation 2. Alternatively, for the reasons stated in Issues One and Three, the Court should vacate the district court's revocation judgment and remand for further proceedings with the district court considering only Violations 1 and 2 as Grade C violations. Further in the alternative, for the reasons stated in Issue One alone, the Court should remand for a resentencing hearing at which the district court considers only Violations 1 and 2 and the Guidelines range of 21 to 24 months; or, for the reasons stated in Issue Two alone, the Court should remand for a resentencing hearing at which the district court does not consider Violation 1.

Respectfully submitted,

PHILIP G. GALLAGHER
Federal Public Defender
Southern District of Texas

s/ Kathryn Shephard
KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone:  (713) 718-4600

## CERTIFICATE OF SERVICE

All parties required to be served with copies of this document have been so served by filing via the Fifth Circuit ECF filing system.

s/ Kathryn Shephard
KATHRYN SHEPHARD

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,290 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 software (current version) in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

3.    This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because the brief has been redacted of any personal data identifiers.

4.    This brief complies with the electronic submission of 5th Cir. R. 25.2.1 because this brief is an exact copy of the paper document.

5.    This brief is free of viruses because the brief has been scanned for viruses with the most recent version of a commercial virus scanning program.

s/ Kathryn Shephard
KATHRYN SHEPHARD